## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **GEMELEE DEPASQUALE,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **C.A. No. 22-** |
| | : | |
| **GIRLS INCORPORATED OF** | : | |
| **WORCESTER, alias,** | : | <u>**Jury Trial Demanded**</u> |
| **and VICTORIA WATERMAN,** | : | |
| **Defendants** | : | |

### COMPLAINT

### I.    <u>Introductory Statement</u>

This action is brought by the Plaintiff seeking declaratory and injunctive relief and compensatory and punitive damages for acts and/or omissions of Defendants in violation of Plaintiff's rights under **Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.* **("Title VII")**, the **Americans with Disabilities Act of 1990, 42 U.S.C. § 12101,** *et seq.* **("ADA")**, the **Massachusetts Fair Employment Practices Act, M.G.L. c. 151B § 1,** *et seq.* **("FEPA")**.

### II.    <u>Parties</u>

1.    Plaintiff Gemelee DePasquale is a resident of the City of Milford, County of Worcester, and State of Massachusetts.

2.    Defendant Girls Incorporated of Worcester, alias, (hereinafter referred to as "GIW" or "Defendant GIW") is a domestic non-profit corporation duly incorporated under the laws of the State of Massachusetts, with a principal office located at 125 Providence Street, Worcester, Massachusetts.

3.    Defendant Victoria Waterman (hereinafter referred to as "Ms. Waterman" or "Defendant Waterman") was, at all relevant times during Plaintiff's employment with GIW,

Plaintiff's direct supervisor and employed by GIW as its Chief Executive Officer ("CEO") at its office located at 125 Providence Street, Worcester, Massachusetts.

4.       Unless otherwise specified, the term "Defendants" as hereinafter used shall refer collectively to each and every Defendant named in this Complaint.

### III.       Jurisdiction

5.       This Court has jurisdiction pursuant to 28 U.S.C. §§1331 because Plaintiff asserts claims arising under federal law; specifically, the Civil Rights Act, Title VII, ADA and FMLA.

6.       Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. § 1367 as they arise out of the same case or controversy.

### IV.       Venue

7.       Venue is proper in this Court since, on information and belief, all of the Defendants reside or may be found in the District of Massachusetts in compliance with the requirements set forth in 28 U.S.C. §1391. Venue is also proper because a substantial part of the events or omissions giving rise to the claims occurred in the District of Massachusetts.

### V.       Exhaustion of Administrative Remedies

8.       On or about February 24, 2021, Plaintiff filed a charge with the Massachusetts Commission Against Discrimination ("MCAD") and the United States Equal Employment Opportunity Commission ("EEOC") against Defendant, alleging discrimination on the basis of her race and/or color and her disability.

9.       Thereafter, Plaintiff filed a Request for Notice of Right to Sue with the MCAD and the EEOC.

10.       On October 5, 2021, the MCAD issued Plaintiff a Dismissal and Notice of Right to Sue.

11.    On November 30, 2021, the EEOC issued Plaintiff a Notice of Right to Sue.

12.    Accordingly, insofar as Plaintiff has satisfied all administrative and/or jurisdictional requirements prior to filing a lawsuit, Plaintiff has timely instituted suit in the within matter.

### VI.    Material Facts

#### Factual Background

13.    Plaintiff is a Black, African American female.

14.    GIW is an organization founded over 100 years ago with the mission to inspire all girls to be Strong, Smart, and Bold, and specifically strives to equip girls to navigate gender, economic and social barriers and grow into healthy, educated, and independent adults.

#### Initial Hiring and Discriminatory Workplace

15.    On December 3, 2018, Plaintiff was hired by Defendants to be the Business Manager - a position within the leadership team alongside Victoria Waterman and Heidi Paluk ("Ms. Paluk"), the Senior Director of Fund Development.

16.    Plaintiff was hired, in part, because she is a person of color, and that a board member, Sheree Ohen (formerly Marlowe), who was responsible for the diversity efforts at GIW, had advocated for the leadership staff to reflect the population Defendant GIW serves which was made up of approximately ninety-six percent (96%) black and brown girls.

17.    When Plaintiff was hired, she was offered two (2) weeks of paid vacation, full benefits, and a salary of $58,000.

18.    Plaintiff negotiated to receive three (3) weeks of vacation rather than two (2) weeks of vacation.

19.    Plaintiff also negotiated to receive a four-thousand dollar ($4,000) raise once she had served six (6) months in her position.

20.     After being in the position, Plaintiff learned that a position on the leadership team came with four (4) weeks of paid vacation, that her predecessor (White) was offered and received four (4) weeks of paid vacation, and that each of the other members of the leadership team of White origin or race had four (4) weeks of paid vacation.

21.     Plaintiff's role as Business Manager consisted of approximately 60% finance/accounting work and the other 40% was divided between Human Resources, Information Technology, Rental, Camp Caretaker Management, and Maintenance because the Business Office was the hub of the organization that kept the organization operating appropriately.

22.     Although Plaintiff had extensive business and accounting experience when she was hired, Defendants were aware that Plaintiff did not have experience specific to non-profit organizations, but held the necessary skills GIW deemed necessary for success even absent non-profit experience.

23.     In light of her lack of non-profit experience, Plaintiff spent the first couple of months in nearly constant management meetings learning specifics about the organization and non-profit finances and management.

24.     Unfortunately, discriminatory and retaliatory treatment was an ongoing issue for Plaintiff since she was first hired by GIW on or about December 3, 2018.

25.     Specifically, throughout her employment GIW, by and through its agents including Defendant Waterman, consistently and routinely failed and/or refused to treat Plaintiff's race and/or color neutrally and instead subjected Plaintiff to disparate treatment solely on the basis of her race and/or color, which resulted in Plaintiff's discriminatory marginalization and treatment as a second-class employee.

26.     Throughout Plaintiff's employment with GIW, Defendants:

a.  failed and/or refused to treat Plaintiff's race and/or color in a neutral manner;

b.  subjected Plaintiff  to disparate treatment in the terms and conditions of her employment;

c.  created, enforced, or allowed policies and practices that have disproportionately affected the terms, conditions, and benefits of employment with respect to Plaintiff and others in the protected class;

d.  subjected Plaintiff to routine micro and macroaggressions and a hostile workplace because of her race and/or color;

e.  treated Plaintiff and other Black colleagues as second-class and/or "token" employees; and,

f.  retaliated against Plaintiff for reporting disparate treatment in the workplace and asserting Plaintiff's right to non-discriminatory treatment.

27.    As a result, Plaintiff was subjected to physical and emotional harm arising out of the discriminatory actions of Defendants and/or their, agents, which Defendants knew or should have known about, including but not limited to of fear of losing Plaintiff's job, career, and financial security that she has fought so hard to achieve as a Black woman in America, being made to feel inferior, unwelcome, and unworthy of her achievements and position by Defendants, and being treated as incompetent, unqualified, and unvalued on the basis of her race and/or color.

28.    Plaintiff's emotional harm was further exacerbated by the increasing realization that, regardless of her qualifications, how hard she worked, and the high quality of the work she produced Defendant GIW, including its employees, management, executives, and Defendant Waterman, would and will never see her as an equal to her non-Black colleagues solely because Plaintiff is Black.

*Initial Incidents of Discrimination*

29.     Sometime between December 2018 and January 2019, Plaintiff received an email from an external Auditor, Vera Raposa ("Ms. Raposa"), who was responsible for conducting Defendant GIW's annual audit and preparing the Financial Statement.

30.     In that email, Ms. Raposa informed Plaintiff that she had provided Plaintiff's predecessor with multiple spreadsheets and reconciliation templates to help transition the predecessor into the role and that Plaintiff similarly should not hesitate to reach out to Ms. Raposa with any questions that Plaintiff may have because Plaintiff did not have a predecessor present to turn things over to her properly.

31.     Unfortunately, before Plaintiff took over for her predecessor, the majority of Microsoft Excel documents created by the predecessor and/or provided by Ms. Raposa had been deleted thus requiring that Plaintiff spend a great amount time of time recreating those documents.

32.     During that recreation of documents process, Plaintiff discovered that Defendant GIW was erroneously underbudget in payroll because the monthly health insurance expenses had not been entered since July 2018.

33.     When Plaintiff realized the existence of this erroneous under budget accounting and the reason for it, she quickly created a spreadsheet, reconciled the account and created a Journal Entry totaling the amount that was underbudget.

34.     Additionally, Plaintiff entered a Journal Entry for Vacation Accrual for approximately $33,000.

35.     Since Ms. Raposa had previously informed Plaintiff that she should not hesitate to reach out to her, Plaintiff reached out to Ms. Raposa at the time she created the Journal Entry to inform Ms. Raposa that Plaintiff had figured out why the payroll was under budget.

36.     Plaintiff also informed Ms. Raposa that Plaintiff had done the reconciliation and prepared the Journal Entry and asked that Ms. Raposo review the work and provide feedback.

37.     Instead of responding to Plaintiff's email, Ms. Raposa called Defendant Waterman and informed her that Ms. Raposa did not think Plaintiff's work was accurate.

38.     Instead of discussing the matter with Plaintiff directly and privately as she did with other non-Black employees, Defendant Waterman immediately got the Executive Board & Finance Committee involved.

39.     On information and belief, Defendant Waterman went straight to the Executive Board & Finance Committee instead of allowing Plaintiff a proper opportunity to explain the accuracy of Plaintiff's payroll analysis because of Defendant Waterman's stereotypical biases and assumptions that Black individuals are incompetent or cannot be trusted to perform without constant supervision by a White overseer.

40.     Plaintiff was left completely embarrassed and humiliated by Defendant Waterman's decision to openly criticize her competence instead of privately allowing her the opportunity to explain her analysis and its accuracy.

41.     In addition to Plaintiff's work ultimately being accurate, no one in Defendant GIW's leadership ever bothered to explain to Plaintiff what they thought she had done incorrectly.

42.     Over the next few months following January 2019, Defendant GIW, by and through its agents including Defendant Waterman, subjected Plaintiff to an increasingly hostile work environment by incessantly scrutinizing Plaintiff's work and micromanaging Plaintiff.

43.     On information and belief, Defendants' over scrutiny and micromanaging, both of which were unwarranted, were due to Plaintiff's race and/or color, including the belief that a Black "diversity hire" could not handle a role previously handled by a White individual or perform in the same manner or quality as an individual of White background.

44.     The latter was evidenced by the fact neither Defendant Waterman nor any one else in Defendant GIW's leadership scrutinized, micromanaged, or refused direct/private feedback to White employees prior to take any purported issue up the chain of command in the same manner was Plaintiff was treated.

45.     Moreover, whenever Plaintiff asked Defendant Waterman for clarification regarding Plaintiff's work Defendant Waterman was dismissive and belittling regardless of the fact that questions asked by Plaintiff was organization specific such as inquiries about the square footage of the building.

46.     Instead of simply answering the question or directing Plaintiff, Defendant Waterman would respond "you are asking me too much" and "you should know how to do your job" in a demeaning manner.

47.     On the other hand, Plaintiff would observe Defendant Waterman readily answering questions posed by her White colleagues without making demeaning remarks about the colleague's competency.

48.     Ironically, Defendant GIW, an organization allegedly dedicated to uplifting girls, serving primarily those of color, caused Plaintiff to start losing confidence in herself even though Plaintiff knew she had done nothing wrong.

### Additional Discrimination/Hostile Work Environment as of March 2019

49.     In March 2019, Defendants hired Allison James ("Ms. James") as the new Chief Operations Officer (COO).

50.     Unlike Plaintiff, Ms. James, who is white, was offered 4 weeks of vacation as a member of the leadership team.

51.     Almost right away, Ms. James was inexplicably rude and demeaning to Plaintiff.

52.     Ms. James was not similarly rude and demeaning to Plaintiff's White colleagues, but instead aimed her disparate treatment on the Plaintiff.

53.     For example, Ms. James ignored Plaintiff's greetings and generally refused to speak to Plaintiff during the workday.

54.     When Ms. James did speak to the Plaintiff, it was to openly criticize her for asking questions and providing opinions instead of just doing what she was told.

55.     In fact, on at least one occasion, Ms. James embarrassed Plaintiff by yelling at her in front other colleagues for implementing a system change that had been preplanned and that Ms. James was aware of.

56.     Indeed, Ms. James and Defendant Waterman's actions led Plaintiff to believe that Defendants only wanted Plaintiff to fill a "diversity-hire" role instead of being a meaningful and contributing member of Defendant GIW, which would and did ultimately detrimentally impact Plaintiff's ability to grow in the organization.

57.     On information and belief, Defendant GIW, Defendant Waterman, and Ms. James did not treat other White employees in the same discriminatory manner and instead welcomed their opinions.

58.     In addition, Plaintiff frequently observed Defendant Waterman, Ms. Paluk and Ms. James texting each other and making eye contact and other signals with each other in a mocking manner directed towards Plaintiff while Plaintiff was speaking or presenting.

59.      Defendant Waterman, Ms. Paluk and Ms. James did not behave this way when Plaintiff's White colleagues presented or spoke.

60.     Further, during meetings Defendant Waterman would often go around the room asking for ideas or opinions from White colleagues, but would ignore Plaintiff entirely or immediately dismiss Plaintiff's ideas/opinions in contrast with Plaintiff's White colleagues.

61.     As a result of being subjected to a hostile work environment, ignore, and mocked, over time Plaintiff lost her confidence and spoke up less in meetings since Defendant GIW and its leadership seemingly only valued input from its non-Black employees.

### *FY20 Budget & Audit and Disparate Treatment*

62.     Between April and May 2019, Plaintiff worked on building the budget for the upcoming financial year FY20 (July 2019 – June 2020).

63.     Despite Plaintiff's qualifications, lack of any discipline or warnings regarding Plaintiff's performance, and the accuracy and quality of Plaintiff's work to-date, Defendant GIW and Defendant Waterman continue to micromanage Plaintiff to the highest degree - indeed Defendant Waterman or other agents would often stand over Plaintiff's shoulders as she worked.

64.     That constant micromanagement was one of the most undermining and discriminatory experiences of Plaintiff's professional life confirming Defendants' stereotypical bias against the competence of Black individuals such as herself.

65.     The preceding is confirmed by the fact that, again, Plaintiff's White colleagues, including those with less experience, were not micromanaged or treated as incompetent by GIW or Defendant Waterman.

66.     In fact, at one point, Plaintiff noticed multiple errors in the FY19 budget that was prepared by her White predecessor. Despite Defendant Waterman over scrutinizing Plaintiff's work and micromanaging her, when Plaintiff pointed out her White predecessor's errors, Defendant Waterman responded, "I don't know why there are so many errors but maybe you just have to make mistakes and just get stuff done."

67.     Frustrated at the clearly discriminatory and disparate treatment, Plaintiff informed Defendant Waterman of how uncomfortable she felt being micromanaged for no apparent reason related to Plaintiff's qualifications or performance.

68.     Subsequently, Plaintiff asked Ms. Paluk why there were so many errors in the FY19 budget and whether they stood over Plaintiff's predecessors shoulders the same way they were standing over Plaintiff's. Ms. Paluk responded by stating that was not the case with Plaintiff's predecessor.

69.     As it drew closer to the time for the annual audit, Plaintiff informed Defendant Waterman that Plaintiff may need assistance since this was Plaintiff's first nonprofit audit, which was a reasonable request similar to that requested by Plaintiff's White predecessor and granted by Defendant GIW.

70.     Defendant GIW hired a bookkeeper consultant, Worcester Bookkeeping, that helped to prepare spreadsheets such as the Temp Restricted Schedule, The Statement of Functional Expenses, and a few others, but 80% of the preparation for the audit was done by Plaintiff.

71.     All of the work Plaintiff performed between December 2018 and June 2019 was in accordance with Generally Accepted Accounting Principles ("GAAP") and resulted in a very positive audit with a Good Management letter and less Adjusting Journal Entries from the auditor compared to the work performed by Plaintiff's predecessor the prior year.

72.     Despite Plaintiff's success, during her six-month performance review, Defendant Waterman informed Plaintiff that Defendants would not be able to honor the $4,000 salary increase previously negotiated because Defendants had to pay for the bookkeeper consultant.

73.     However, Defendant GIW had previously paid for a consultant for Plaintiff's White predecessor and did not reduce or refuse to grant salary increases to Plaintiff's White predecessor on the same grounds.

### *Complaints of Discrimination*

74.     As GIW's discriminatory environment became increasingly clear, Plaintiff complained about to the leadership team, including primarily to Defendant Waterman, on various occasions in 2019 about the disproportionate workplace treatment towards minority staff members, including herself.

75.     For example, in or around June/July of 2019, Plaintiff complained to Defendant Waterman that her treatment towards Plaintiff was very biased.

76.     Plaintiff asked Defendant Waterman if she was aware of the term "Unconscious Bias," to which she replied that she was aware of the term including "Implicit and Explicit Bias" and expressed alleged "interest" in discussing the matter more with me.

77.     Subsequently, Plaintiff and Defendant Waterman met on several occasions to discuss race/color-based inequity and discriminatory treatment generally and specific to what Plaintiff was experiencing throughout the workplace, yet no remedial actions were taken by Defendants.

### *Further Unchecked Racial Animus at GIW and Complaints*

78.     In or around July 2019 during a meeting, Defendant Waterman embarrassed Plaintiff by openly mocking a budget that Plaintiff created and claiming that Plaintiff had a "disadvantage."

79.     On information and belief, Defendant Waterman used the term "disadvantage" in a discriminatory manner and based on stereotypical beliefs relating to Plaintiff's race and/or color.

80.     During that meeting Defendant Waterman  also stated that she did not know how Plaintiff came up with the numbers, but when Plaintiff tried to explain the spreadsheet and her accounting methods, Defendant Waterman simply ignored her.

81.     In comparison, Ms. James (White) was to scheduled to present a spreadsheet during that same meeting, but did not have it ready to present.  Defendant Waterman told her it was fine and left it at that.

82.     Following that meeting, Defendant Waterman was informed by Ms. Paluk that Plaintiff's budget was correct and that Plaintiff had used the correct analysis.

83.     Ultimately, Defendants applied for and received a grant using Plaintiff's budget.

84.     During a subsequent one-on-one meeting between Plaintiff and Defendant Waterman, Plaintiff complained about the disparity in the treatment Plaintiff received in the workplace compared to her White colleagues and cited the above incident as an example.

85.     Instead of apologizing and seeking to correct the discriminatory environment Plaintiff was being subjected to, Defendant Waterman told Plaintiff to "grow thicker skin."

86.     In November 2019, Defendant GIW's work culture and inclusiveness was brought up during a staff meeting when one staff asked if Defendant GIW celebrated any kind of Kwanzaa, to which Defendant Waterman responded that it did not.

87.     Upon further discussion during that leadership meeting, it was determined that Defendant GIW did not have a well-defined culture with diversity and inclusion.

88.     In response, Defendant Waterman hired Judith Fleming ("Ms. Fleming"), a White long-time friend of Ms. Waterman, as the new Human Relations Specialist to create and cultivate an organizational culture of diversity and inclusion.

89.     Notably, Ms. Fleming was hired for the role despite well-qualified and/or better-qualified persons of color within the organization and already involved in trying to tackle this sensitive topic being available for the position.

90.     Around that same time, Plaintiff conducted a performance review of the Accounting Assistant, Kenia Sanchez ("Ms. Sanchez"), also a person of color who reported directly to Plaintiff.

91.     Because Ms. Sanchez was a great employee who was extremely focused and hard-working, produced high quality work, did a great job, met all her deadlines, and worked very well with Plaintiff, Plaintiff gave her a good review and asked for a raise from the $16 per hour she was earning, which was way below the industry rate for such a position.

92.     In response to this review, Plaintiff was reprimanded by Defendant Waterman, who stated no one in the organization ever receives a review with such a high rating and that, as a result of Plaintiff's review of Ms. Sanchez, Defendant Waterman did not think Plaintiff understood how to manage and should have never given such a high rating.

93.     Plaintiff found this response was belittling and discriminatory as she was Ms. Sanchez's supervisor and was best able to attest to Ms. Sanchez's work ethic and competence.

94.     Defendant Waterman's hostile response caused Plaintiff to feel as though both she and Ms. Sanchez were being demeaned and unappreciated due to their race and/or color.

95.     Defendant Waterman's statements smacks of race/color-based bias built on stereotypical assumptions that people of color can never perform at or above the same level as White individuals, both as subordinates and as managers.

### *January 2020 Pretextual and Retaliatory Performance Review*

96.     In January 2020, Plaintiff received her one-year performance review from Defendant Waterman.

97.     Despite Plaintiff's excellent work performance and achievements, her January 2020 performance review rating was "marginal."

98.     In the review, Defendant Waterman falsely claimed that Plaintiff lacked confidence, did not speak up in meetings, did not have the qualities of a leader, and did not create a particular spreadsheet to track multiple projects, called a Business Office Work Plan.

99.     Notably, any decrease in Plaintiff speaking up in meetings and in her confidence were the direct result of the marginalization and discriminatory treatment Plaintiff was subjected to and complained about on various occasions.

100.    The January 2020 performance review included a Performance Improvement Plan requiring that Plaintiff create the Business Office Work Plan by January 31, 2020, and to include all projects Plaintiff was expected to work on, or Plaintiff would be subject to disciplinary action up to and including termination.

101.    During the meeting, Plaintiff informed Defendant Waterman that she would not sign the review because Plaintiff did not agree with the assessment and believed the allegations in the were false.

102.    Subsequently, Defendant Waterman scheduled a meeting with herself, Plaintiff and Ms. Fleming, the Human Relations Specialist, during which Plaintiff reiterated that she spoke up less in meetings because she felt invisible and ignored and treated in a discriminatory manner.

103.    During that same meeting, Plaintiff also expressed that the Business Office was meeting deadlines and respectfully disagreed that she needed to create a Work Plan, particularly in the format Defendant Waterman wanted, because it was outside the scope of Plaintiff's job duties and because the work to be included in the work plan was mostly complete.

104.    Nevertheless, upon Defendant Waterman's insistence, Plaintiff agreed to create the Work Plan, which Defendant Waterman developed a spreadsheet for and Plaintiff kept updated.

105.    Moreover, Plaintiff ultimately signed the performance review, which she still did not agree with, so that Plaintiff could move on and continue to perform her job.

106.    Plaintiff's negative performance review came only after Plaintiff raised concerns about race/color-based discrimination in the workplace.

107.    Additionally, Plaintiff's performance review mandated that Defendant Waterman monitor Plaintiff's progress and meet with Plaintiff for a follow-up meeting no later than three months from January 17, 2020, but this never happened.

### *Additional Complaints of Discrimination and Retaliation*

108.    In a separate meeting around January 2020 with Ms. Fleming, Plaintiff continued to express her concern that Defendant GIW was treating minority staff members of color, including herself, differently and asked why Plaintiff was the only member of the leadership team who only received three (3) weeks of vacation time, rather than the four (4) weeks all other leadership team members received as required by company policy.

109.    Ms. Fleming was left without words, could not answer Plaintiff inquiry, and did not address her concerns.

110.    In February 2020, Plaintiff asked Defendant Waterman whether GIW had a Black History month program, because Girls Inc. predominantly served black and brown girls and Plaintiff had not seen any emails or announcements about Black History-related programs or events.

111.    In a follow-up meeting with the leadership team in February 2020, instead of simply acknowledging that there was no such program, Defendant Waterman reprimanded Plaintiff for asking her about Black History-related programs and told Plaintiff that if Plaintiff wanted to know if there was a program, then Plaintiff should walk around the organization so she could know what was going on.

112.    Ms. James, the COO, also became upset that Plaintiff asked about Black History Month programming, stating Plaintiff was questioning the work Ms. James does.

113.    Plaintiff explained that she was simply asking because she did not see or hear of any activities relating to Black History month and that Plaintiff thought such activities would be a great teaching moment and experience for our members, who happen to be predominantly black and brown girls.

114.    Instead of listening to and considering Plaintiff's opinion, Ms. James did not speak to Plaintiff for almost two weeks, which was unprofessional, disrespectful, petty, and a continuation of the discriminatory and retaliatory treatment Plaintiff received whenever Plaintiff brought up issues related to race or color.

115.    Additionally, after the February 2020 meeting, both Ms. James and Defendant Waterman stated they would no longer meet with Plaintiff if Ms. Fleming was not present and started copying Ms. Fleming on every email communication exchanged with Plaintiff.

116.    On information and belief, no White employee was subjected to the same above-treatment.

### Plaintiff's Performance During the COVID-19 Pandemic

117.    In March 2020, Defendant GIW closed its Worcester office and all staff were required to work from home due to the COVID-19 Pandemic.

118.    As a result, many staff members, including Plaintiff, took company laptops home to work remotely.

119.    While working remotely, Plaintiff conducted intensive research on the Small Business Association ("SBA") Paycheck Protection Program ("PPP") and informed Defendant Waterman that Defendant GIW was eligible to apply for the loan.

120.    As usual, Defendant Waterman did not believe Plaintiff until Plaintiff forwarded her expensive information demonstrating that Defendant GIW was eligible.

121.   Even after being shown Defendant GIW's clear eligibility, Defendant Waterman told Plaintiff that she would still need to speak to GIW's Board Treasurer, a White individual, to confirm that Plaintiff was correct about Defendant GIW's eligibility.

122.   It was only after Defendant GIW's Board Treasurer agreed with Plaintiff's determination that Defendant Waterman instruct Plaintiff to apply for the PPP loan.

123.   Plaintiff then created and submitted a successful application resulting in Defendant GIW receiving $191,000 which allowed it to keep all staff hired during the unexpected pandemic/quarantine.

### Further Discrimination and Retaliation in 2020

124.   In May 2020, when Michelle Obama's documentary was aired, Plaintiff recommended that Defendant GIW have a "virtual movie day" with the girls, have them watch the documentary, and host a question-and-answer session.

125.   Plaintiff expressed how important she believed it was to have the girls see Michelle Obama as a role model and went on to express that at the end of the documentary, there was a Girls Inc. girl, and Plaintiff thought the girls in Worcester would be ecstatic to see that.

126.   Ms. James simply refused Plaintiff suggestion and the event never took place.

127.   Also, in May 2020, around the time George Floyd was killed and videos regarding the killing of Ahmaud Arbrey were leaked, Plaintiff expressed how much her family was affected, particularly considering that she has a Black son.

128.   After some prodding by Plaintiff, Defendant Waterman agreed to do as many organizations were doing at the time and write a letter to the community regarding changes Defendant GIW planned to implement within the organization to fight against racism.

129.    Defendant Waterman even promoted Plaintiff to Staff Chair of the Diversity & Inclusion Committee where Plaintiff was very vocal about disparity, marginalization, and injustice in the workplace of which most were ignored.

130.    However, it quickly became clear that this was only a token position meant to look good in the public eye because Plaintiff was subsequently no longer being invited to the regular weekly leadership team meetings, which were being held without her.

131.    Sometime in June/July 2020, Plaintiff received an email with a restructured organization chart and noticed that her title/box on the chart had been moved further down so that she and her job were no longer identified as part of the leadership team.

132.    Plaintiff was neither informed nor consulted about this change other than receiving the new organizational chart at the same time as all other staff.

133.    By this time in July/August 2020, Plaintiff was no longer included in leadership meetings, was not involved in the decisions of Defendant GIW such as restructuring, and was not even allowed to prepare the annual budget, all without any explanation.

134.    Plaintiff was also ostracized and belittled buy Defendant Waterman and others in many zoom meetings.

135.    Subsequently, Defendant GIW announced that everyone would return to the office on August 24, 2020, since over 90% of the staff was working from home due to the pandemic.

136.    However, on Thursday August 6, 2020, Plaintiff received an email from Defendant Waterman stating that Plaintiff should return to work on Monday, August 10, 2020, prior to everyone else.

*Pattern and Practice of Discriminatory Treatment*

137.    In August 2020, Plaintiff received notification that two staff members of color had resigned around August 4 and 7, 2020.

138.    ***On information and belief, that was part of an ongoing pattern where staff members of color were only staying with the organization for short periods of time.***

139.    Plaintiff reported the ongoing pattern to Defendant Waterman and asked Defendant Waterman if they could discuss the disparities in the workplace leading to such widespread resignations by staff of color.

140.    On August 10, 2020. Defendant Waterman and Plaintiff met and Plaintiff again voiced her concerns regarding the disparate treatment and/or impact of Defendant GIW's policies on other Black staff members and staff members of color.

141.    Plaintiff asked Defendant Waterman if they could work together to find the root of the extremely high turn-over rate among staff of color, but only Defendant Waterman dismissively asked "how is it that so many staff of color leave in such a short space of time, yet you [are] still with the organization for over one (1) year."

142.    Subsequently in or around August 2020, Defendant GIW held a team session where leadership staff were asked to determine how to spend $500 that was remaining from contributions given by the Board of Directors to help staff members in need.

143.     Ms. James recommended that Defendant GIW give the money to a staff member who needed help to purchase a car to get to and from work.

144.    Plaintiff responded that while she thought this was a great recommendation, she wanted to get a better understanding of the factors they were using as an organization to determine which staff member or members get help when in need.

145.     Ms. James sneakily responded, ***"I bet you think the staff I want to give the $500 to is white…"***

146.     When Judith Fleming asked Ms. James to calm down, Ms. James said, ***"no, I will not calm down because this is bullshit…"***

147.     Plaintiff responded by saying, "Ms. James, I don't care if the person is black, white or purple, I simply have a clarifying question."

148.     Instead of admonishing Ms. James for her inappropriate and discriminatory outburst, Ms. Fleming asked ***Plaintiff*** to expound on the reasoning behind her question and Defendant Waterman silenced Plaintiff by stating that she should not have brought up her question in that meeting.

149.     During that meeting, Plaintiff went on to ask why Defendant GIW had increased all the front-line program staff hourly rate by $2.00 for COVID hazard pay but did not increase the janitor's, a man of color, pay even though he was front-line staff and was asked to return to work in April before anyone else went back into the building.

150.     Ms. James simply responded, "He is not my staff, I increased the pay for my staff only."

151.     Plaintiff reminded Ms. James that she is the COO and therefore everyone who works for Defendant GIW are her staff and her responsibility.

152.     Plaintiff further noted that she was aware of a Black staff member who was facing extreme hardship and had advised Defendant GIW that the staff member did not have the means (laptop or smart phone) to be able to work from home during the pandemic.

153.    Instead of helping the staff member succeed by loaning them a laptop, Defendant GIW fired the staff member on June 13, 2020, just as soon as doing so would not affect the PPP Loan Forgiveness requirements.

154.    Subsequently, the Black staff member applied for unemployment and Ms. James and Ms. Fleming contested it by stating the Black staff member had abandoned the job.

155.    The foregoing treatment of a Black staff member was starkly discriminatory compared to how Defendant GIW treated its White staff members.

156.    For example, while Defendant GIW consistently offers severance packages to its White staff members, Black staff members, or staff members of color, are disproportionately terminated without severance offers.

157.    For more than a week and a half following this meeting, Defendant Waterman and Ms. James did not speak to Plaintiff.

158.    At a later date in August 2020, Plaintiff met with Ms. Fleming, who at that point had been promoted to Chief Human Resource Officer and was paid $30 per hour (a $5 increase within six months), to discuss her concerns about the high rate of turnover among Black women and women of color in the organization.

159.    Plaintiff told Ms. Fleming that she could be a helpful part of the changes needed to address this high turnover, particularly given her formal role in fostering diversity and inclusion and could also recommend some diversity resources.

160.    As with all of Plaintiff's other meetings with managers, rather than having her concerns taken seriously, Ms. Fleming ignored Plaintiff's concerns and informed her that Defendant GIW had retained an attorney because of a discrimination claim filed against Defendant GIW by a former employee.

161.    Plaintiff asked Ms. Fleming how is it that Plaintiff was not made aware of the discrimination claim considering that Plaintiff was co-chair of the diversity & inclusion committee as well as a member of the management team.

162.    Ms. Fleming replied that Plaintiff needed to keep her head down and say nothing about that situation.

163.    Sometime in late August/early September 2020, Plaintiff received an invitation from Ms. Fleming to meet with an attorney retained by Defendant GIW to investigate discrimination within the organization.

164.    Although Plaintiff was hopeful that this was a step in the right direction, the meeting with the attorney and Ms. Fleming was again hostile and frustrating.

165.    Plaintiff gave the attorney examples of how she felt she was treated differently because of her race and/or color, but the attorney insisted that Plaintiff instead tell him how *others* were treated.

166.    Plaintiff replied that it would be better if he spoke directly to the other staff members who were affected as Plaintiff did not want to misrepresent their experiences, but the attorney kept asking Plaintiff to tell him about other employees' experiences and became irritable when Plaintiff was not able to answer his questions about others.

167.    When Plaintiff told the attorney that she did not feel comfortable in the meeting anymore, Ms. Fleming demanded the meeting cease and Plaintiff left the meeting again feeling as if she was being treated like the problem.

168.    The next few weeks following Plaintiff's conversation with Ms. Fleming and GIW's attorney were the hardest of her tenure at GIW because now neither the CEO, the COO, nor CHRO would speak to her.

169.    Defendant Waterman, for example, would cut Plaintiff off while she was speaking during finance and other meetings.

### Additional Retaliation and Letter to Girls Inc. National

170.    On August 28, 2020, Plaintiff drafted a letter to the national branch of Girls Inc. ("Girls Inc. National) to explain that she believed Defendant GIW was not adhering to the national mission and code of conduct of Girls Inc. to fight discrimination.

171.    This letter was a more detailed version of the email Plaintiff sent to Defendant Waterman around August 6, 2020 requesting to meet regarding the high rate of turnover among staff of color.

172.    Plaintiff however held off on sending the letter to Girls Inc. National hoping she could work things out and get through to Defendants.

### Plaintiff's Request for Accommodations

173.    On Wednesday, November 18, 2020, Defendant Waterman and Ms. James instructed Plaintiff to make changes to a financial report she had prepared allegedly because they believed contained a misrepresentation.

174.    Plaintiff respectfully informed Defendant Waterman and Ms. James that the report was done  in accordance with Generally Accepted Accounting Principles, was accurate, and email that she could not truthfully make the requested changes.

175.    Prior to November 18, 2010, Plaintiff had started experience severe stress and anxiety that started manifesting itself as lumps in her breast, profuse sweating, constant headaches and dizziness, and a single lump in her left calf as a direct result of the unremittingly and increasingly hostile work environment that Plaintiff was subjected to.

176.     After the November 18, 2020 discussion with Defendant Waterman and Ms. James telling Plaintiff to take improper and unethical action regarding the budget in an effort to set Plaintiff up to fail, Plaintiff began experiencing palpitations and intense anxiety.

177.     As a result, on November 18, 2020 Plaintiff contacted her doctor who advised her that she stay home from work on November 19, 2020.

178.     On the morning of November 20, 2020, Plaintiff sent an updated version of the letter she had initially drafted on August 28 to the CEO and President of the Board of Directors of Girls Inc. National describing the situation at Defendant GIW and begging for assistance in addressing a culture where "[p]eople of color in the organization are often ridiculed, oppressed, and shunned when we speak up."

179.     In that letter Plaintiff informed Girls Inc. National that the stress caused by her experience had begun to have a detrimental impact on her health, and wrote, "*I feel it is vital to the health of this organization that an external review be done to understand the practices so that we can better serve our girls and community.*" (Emphasis in original.)

180.     On November 20, 2020, Plaintiff received a meeting notice from Defendant Waterman inviting me to a face-to-face meeting scheduled for Monday, November 23, in the office.

181.     On the advice of Plaintiff's doctor, Plaintiff responded to Defendant Waterman that she was not feeling well and would be submitting a request for sick leave and was waiting on a doctor's note.

182.     At this point the anxiety, stress, palpations dizziness, headaches, and lumps in Plaintiff body prevented her from coming to work and she needed a short leave of absence to

deal with the medical condition she was now suffering from due to the discrimination and abuse she had suffered working at Defendant GIW.

### *Abrupt Termination*

183.     On November 23, 2021 at 8:16 a.m., Plaintiff submitted a doctor's note to Defendant Waterman and Ms. Fleming advising that she was under the care of her medical provider and would be out of work until November 25.

184.     At 9:03 a.m. that day, Plaintiff received a text message from Ms. Fleming asking if Plaintiff was joining the meeting via Zoom or phone; to which Plaintiff responded that she was not well and had provided a sick leave note earlier that morning to Ms. Fleming and Defendant Waterman.

185.     Despite Plaintiff's response and her submission of a sick leave note Ms. Fleming still responded, "Would you prefer phone or zoom."

186.     Plaintiff then received a voicemail from Defendant Waterman at 9:11 a.m. stating that Defendant Waterman was waiting for Plaintiff to join the call.

187.     At 10:01 a.m., Plaintiff received a text message from Ms. Fleming instructing Plaintiff to check her personal email.

188.     The email was marked as having been received at 9:39 a.m. with a severance package worded as if Plaintiff had resigned and included an offer to pay Plaintiff four weeks salary plus her accrued vacation, a non-contest provision if Plaintiff applied for unemployment claims, and a non-disclosure agreement.

189.     Plaintiff refused to sign the severance agreement and informed both Defendant Waterman and Ms. Fleming that they were taking retaliatory actions against Plaintiff because she had spoken up about the racial inequities in the organization.

190.    Plaintiff received a text message from Ms. Fleming on the next day, November 24, asking Plaintiff to check her personal email for her final paystub (paying out accrued vacation and hours for the last day worked on 11/23/20) and to plan to come to the office the next week to pick up Plaintiff's personal belongings and return the company's laptop.

191.    Subsequently, Plaintiff was notified by a GIW board member that Defendant Waterman falsely announced that Plaintiff had resigned during November 25, 2020 board meeting.

### *Race/Color Discrimination*

192.    Plaintiff is a Black, African-American female.

193.    For the reasons discussed above, Defendants' conduct, both directly by Defendant Waterman and by and through Defendant GIW's agents and/or employees, constitutes racially motivated and unlawful discrimination under Title VII and the FEPA.

194.    The fact that Plaintiff is  Black, African-American was a motivating factor in her discriminatory treatment and eventual termination.

195.    The fact that Plaintiff raised concerns about the discriminatory treatment faced by her and others in the same protected class by Defendant GIW was a motivating factor in Plaintiff's discriminatory treatment and eventual termination.

196.    Adverse employment action based in whole or even in part on account of race and/or color constitutes prohibited discrimination and/or retaliation.

197.    Additionally, at all relevant times, Plaintiff was subjected to race and/or color based discriminatory conduct with the purpose or effect of unreasonably interfering with her work performance or creating an intimidating, hostile or offensive work environment for the reasons set forth herein.

198.    Said discriminatory conduct resulted in Plaintiff having to endure working conditions that are both objectively and subjectively offensive.

199.    Defendants' failure to follow GIW's own policies and procedures relative to unlawful discrimination, harassment, and retaliation further supports an inference of discriminatory intent.

200.    The temporal proximity of Plaintiff's protected conduct to Defendants' adverse employment actions also raises a compelling inference of discriminatory and retaliatory intent.

### *Pattern or Practice/Disparate Impact*

201.    On information and belief, Defendant GIW, by and through its agents/employees including Defendant Waterman, has engaged in a pattern or practice of discriminating against employees in the protected race and/or color class.

202.    In fact, within the last year of Plaintiff's employment with Defendant GIW, GIW terminated at least seven (7) other employees of color, including four (4) Black women, one (1) Black man, and two  (2) Hispanic women.

203.    In addition to the above high rate of termination, Plaintiff observed a high rate of turnover of employees of color, communicated with several employee who confirmed that they also felt discriminated against, observed a pattern of disproportionate and discriminatory treatment of persons of color, including both staff and the girls involved in GIW's programs.

204.    Additionally and/or in the alternative, Defendants' employment policies or practices referenced herein, or the enforcement of said polices or practices, have a disproportionately adverse effect on Black employees, including Plaintiff and other similarly situated coworkers, for the reasons set forth herein such that Defendants have violated Title VII and the FEPA.

*Retaliation*

205.    At all relevant times, Plaintiff informed Defendants of and complained to them about widespread race/color-based discrimination in the Defendant GIW workplace against herself and other employees.

206.    Under Title VII and FEPA, Plaintiff is expressly protected from retaliatory conduct by an employer for voicing concerns of ongoing race/color discrimination with regard to herself and/or other individuals in the protected class.

207.    When Plaintiff reported what she believed to be systemic race/color discrimination within Defendant GIW she was engaged in a protected activity.

208.    After engaging in the above-mentioned protected activity Plaintiff was placed on a unwarranted PIP.

209.    After engaging in the above-mentioned protected activity Plaintiff was terminated by Defendants without any prior notice or warning or reason.

*Disability Discrimination*

210.    Additionally and/or in the alternative, the circumstances of Plaintiff's termination establish a prima facie case of disability discrimination under applicable law insofar as: (1) the medical conditions from which Plaintiff was suffering, stress and anxiety, qualify as disabilities under applicable law; (2) Plaintiff was qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) Defendants terminated Plaintiff employment due to her disability and/or because Defendants regarded or perceived Plaintiff as having an impairment and/or because there was a record of Plaintiff's impairment.

211.    The disabilities that Plaintiff suffers from, stress and anxiety, qualify as disabilities under the ADA and FEPA.

212.    At all relevant times, these disabilities substantially limited one or more major life activities, including the ability to concentrate.

213.    On information and belief, Defendants replaced Plaintiff or had her duties assumed by one or more worker(s) who are/were neither disabled nor perceived as being disabled.

214.    Plaintiff's abrupt termination after substantial and loyal service, without prior notice, warning, or opportunity to correct any purported deficiency is an adverse employment action, which gives rise to a compelling inference of discriminatory animus.

215.    Additionally, the close temporal relationship between Plaintiff's taking needed leave to address her disability and her termination—literally within hours of sending a doctor's note requesting three days of leave—provides a compelling inference of discriminatory animus.

216.    Pretext may also be established where, as here, an employer fails to follow its own policy and procedures relative to, among other things, employee attendance and discipline.

### *Failure to Provide Reasonable Accommodation*

217.    At all relevant times, Defendants were aware that Plaintiff had need of a reasonable accommodation due to her disability in the form of an intermittent medical leave of absence.

218.    Rather than provide the very reasonable accommodation sought, Defendants instead terminated Plaintiff due to her disability and/or because Defendants regarded or perceived Plaintiff as having such an impairment and/or because there was a record of Plaintiff's impairment.

219.    Additionally, Defendants retaliated against Plaintiff for needing and/or requesting a reasonable accommodation in the form of a brief leave of absence or other reasonable accommodation by terminating her employment.

220.    The temporal proximity of adverse conduct against Plaintiff in relation to her request for a reasonable accommodation also supports an inference of discriminatory intent.

### *Individual Liability*

221.    Defendant Waterman is individually liable pursuant to M.G.L. c. 151B §§ 4, 4A, and 5 for the acts and/or omissions/failure to act alleged herein.

222.    At all relevant times, Defendant Waterman was Plaintiff's direct supervisor with direct control over her employment.

223.    At all relevant times, Defendant Waterman had authority or a duty to act on GIW's behalf to prevent the unlawful acts or commissions alleged herein.

224.    At all relevant times, Defendant Waterman's acts and/or failure to act as alleged herein directly implicated Plaintiff's rights under M.G.L. c. 151B as alleged herein.

225.    At all relevant times, Defendant Waterman's unlawful acts and/or failure to act as alleged herein were in deliberate disregard of Plaintiff's rights under M.G.L. c. 151B as alleged herein.

226.    At all relevant times, Defendant Waterman intentionally discriminated and/or retaliated against Plaintiff in the manner alleged herein, including by subjecting her to an unwarranted PIP and terminating her employment, because Plaintiff opposed practices forbidden under M.G.L. c. 151B.

227.    At all relevant times, Defendant Waterman intentionally coerced, intimidated, threatened, and/or interfered with Plaintiff's exercise or enjoyment of rights to be free from discrimination, a hostile workplace, and retaliation and to receive reasonable accommodation under M.G.L. c. 151B in the manner alleged herein and/or because Plaintiff aided or encouraged her co-workers in the exercise of their rights under M.G.L. c. 151B in the manner alleged herein.

228.   At all relevant times, Defendant Waterman intentionally aided, abetted, incited, compelled, or coerced Defendant GIW and its agents/employees in the unlawful discrimination, hostile workplace, and retaliation which Plaintiff was subjected to and the denial of Plaintiff's right to receive reasonable accommodation in the manner alleged herein.

### *Motivation to Discriminate and/or Retaliate*

229.   Adverse employment action based in whole or even in part on account of race and/or color and/or disability constitutes prohibited discrimination.

230.   Defendants' patently false and fabricated attempt to define Plaintiff's termination as a resignation is nothing more than pretext, which further supports an inference of discriminatory intent.

231.   An abrupt termination without prior notice, warning, or opportunity to remain employed in a different position, which is the case here, is an adverse employment action that gives rise to a compelling inference of discriminatory animus.

### VII.   Claims for Relief

232.   Plaintiff incorporates in the counts below the allegations contained in ¶¶ 1 through 231 above.

### Count One
### *Title VII of the Civil Rights Act of 1964,*
### *42 U.S.C. § 2000e, et seq.*

233.   As to Defendant GIW, by its individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful employment discrimination and retaliation in violation of Title VII, which has caused Plaintiff to suffer damages as aforesaid and thereby deprived Plaintiff of rights secured under Title VII.

## Count Two
### Americans with Disabilities Act
### 42 U.S.C. § 12101, *et seq.*
### *Discrimination, Failure to Accommodate, and Retaliation/Interference*

234.    As to Defendant GIW, by its acts and/or omissions, including, but not limited to those described herein, discriminated against Plaintiff on the basis of her disability and violated Plaintiff's statutory rights in violation of the ADA, and thereby deprived her of rights secured under the ADA, causing him to suffer damages as aforesaid.

## Count Three
### Massachusetts Fair Employment Practices Act
### M.G.L. c. 151B, *et seq.*
### *Discrimination, Failure to Accommodate, and Retaliation/Interference*

235.    Defendants, by their acts and/or omissions, including, but not limited to those described herein, discriminated against Plaintiff on the basis of her race, color and/or disability and violated Plaintiff's statutory rights in violation of the Massachusetts FEPA, and thereby deprived her of rights secured under the FEPA, causing her to suffer damages as aforesaid.

## VIII.   Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.    A declaratory judgment declaring the acts and/or omissions of Defendants, including, but not limited to those complained of herein, to be in violation of the Civil Rights Act, Title VII, ADA, and the MFEPA.

2.    An injunction or other equitable relief directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated.

3.      An injunction or other equitable relief, including, but not limited to, an award of back pay, front pay or reinstatement, other compensation and/or benefits, and to make her whole for all earnings and benefits she would have received but for Defendants' unlawful conduct.

4.      An award of compensatory damages.

5.      An award of punitive damages.

6.      An award of liquidated damages.

7.      An award of prejudgment interest, reasonable counsel fees and costs of litigation.

8.      Such other and further relief as this Court deems just and proper

**IX**.      **Demand for Jury Trial**

Plaintiff hereby demands a trial by jury on all counts so triable.

**X.      Designation of Trial Counsel**

Plaintiff hereby designates Danilo A. Borgas, Esquire, as trial counsel.

Plaintiff,
**Gemelee DePasquale**
By her attorneys,
**SINAPI LAW ASSOCIATES, LTD.**

**Dated: January 5, 2022**

/s/ **Danilo A. Borgas**
**Danilo A. Borgas, Esq.  (#690709)**
**Chloe A. Davis, Esq. (#691982)**
2374 Post Road, Suite 201
Warwick, RI 02886
Phone: (401) 739-9690
Fax: (401) 739-9040
Email: dab@sinapilaw.com
         cad@sinapilaw.com